# EXHIBIT A

# ORIGINAL

1

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT Of NEW YORK

3   ------------------------------------------------x

4   TRUSTEES OF THE
    LAUNDRY, DRY CLEANING WORKERS AND ALLIED
5   INDUSTRIES HEALTH FUND, UNITE HERE! and
    TRUSTEES OF THE
6   LAUNDRY, DRY CLEANING WORKERS AND ALLIED
    INDUSTRIES RETIREMENT FUND, UNITE HERE!,

7

8                   Plaintiffs,
                                    07CV6999
                                    (DLC(DFE)
9           -against-

10  B&M LINEN CORP. D/B/A/ MIRON & SONS LINEN
    SUPPLY A/K/A MIRON & SONS LINEN, INC.,

11

12                  Defendant.

    ------------------------------------------------x

13

14          DEPOSITION of Defendant by MIRON

15  MARKUS, taken pursuant to Notice, held at the

16  offices of Kennedy, Jennik & Murray, P.C., 113

17  University Place, New York, New York, on

18  January 29, 2008, at 11:40 a.m., before Fran

19  Insley, a Notary Public of the States of New

20  York and New Jersey.

21

22

23          ELLEN GRAUER COURT REPORTING CO. LLC
               126 East 56th Street, Fifth Floor
24                  New York, New York
                      212-750-6434
25                    Ref: 86260

10

                          MARKUS

1
2    to you.
3              Are you under the influence of any
4    drugs or medication that would prevent you from
5    being able to participate fully today?
6         A.    No.
7         Q.    What is the business of B&M Linen
8    Corp.?
9         A.    It is a commercial laundry who
10   provides service to hotels, clubs, restaurants.
11        Q.    Where is it currently located?
12        A.    220 Coster, C-O-S-T-E-R, Street,
13   Bronx, New York 10474.
14        Q.    B&M Linen Corp. is also known as
15   Miron & Sons?
16        A.    Yes, B&M Linen d/b/a Miron & Sons.
17        Q.    For purposes of this deposition I'm
18   going to use the term "Miron & Sons," because
19   that is what we typically refer to.
20        A.    No problem.
21        Q.    Does Miron & Sons have any other
22   locations other than 220 Coster Street?
23        A.    No.
24        Q.    Is Miron & Sons located -- rather
25   active in any other industries other than the

11

1                          MARKUS

2     commercial laundry industry?

3          A.    No.

4          Q.    What is your position at Miron &

5     Sons?

6          A.    President.

7          Q.    How long have you held that

8     position?

9          A.    25 years.

10          Q.    That is a full-time occupation on

11     your part?

12          A.    Yes.

13          Q.    How many employees does Miron & Sons

14     have now?

15          A.    Today?

16          Q.    Yes.

17          A.    About a hundred.

18          Q.    How long has Miron & Sons been

19     located at 220 Coster Street?

20          A.    About a year and a half.

21          Q.    Prior to that point, where was it

22     located?

23          A.    310 Walton Avenue, Bronx, New York

24     10454.

25          Q.    That's 310 Walton?

1                           MARKUS

2               THE WITNESS:  No, I said that.  I

3         said to Wilfredo.  I don't remember.  I

4         remember we had meeting in the union

5         place, and I ask Wilfredo to call Diana so

6         that she is going to be a witness in our

7         meeting, write down everything, without

8         Josh, without anybody.

9               Q.    Now, Diana is the secretary for

10        Wilfredo, correct?

11              A.    Yes, and the same thing with Clay.

12              Q.    And she works at the union?

13              A.    Yes, but when?  You'll kill me.  I

14        don't remember.

15              MR. ZUCKERBERG:  I'm sorry, Tom.  I

16        need a two-minute bathroom break.

17              MR. KENNEDY:  Sure.

18              (A recess was taken from 12:12 p.m.

19        until 12:14 p.m.)

20              Q.    Did your agreement with Wilfredo

21        that people would not go into the union for the

22        first three months after they were hired ever

23        take a written form?

24              A.    I don't think so.

25              Q.    So there was never any writing

33

MARKUS

1

2    reflecting that?

3        A.    No, because those times we had

4    meeting without any witnesses, without anybody.

5        MR. KENNEDY:  Well, let me have

6        marked as Exhibit 6 an agreement made

7        March 20, 2003 between the union and I

8        believe yourself, sir, on behalf of Miron

9        Laundries.

10        Can you look at number 6, sir.

11        (Whereupon an agreement between the

12        union and Miron Laundries dated March 20,

13        2003 was marked as Markus Exhibit 6 for

14        identification, as of this date.)

15        Q.    If you look at -- first feel free to

16    familiarize yourself with the document.  My

17    question after you read it is, is that your

18    signature and Wilfredo's signature that appears

19    on the document?

20        A.    Yes, it is my signature and

21    Wilfredo's signature.

22        Q.    Is it fair to say that at the time

23    you signed this document Wilfredo was the head

24    of the union?

25        A.    Yes.

34

MARKUS

1

2      Q.    Had you reached your oral agreement

3   with Wilfredo before or after signing this

4   agreement that we have identified as Markus

5   Exhibit 6?

6      A.    I don't remember.

7      Q.    Well, you'll note that the second

8   "Whereas" on page 2 says, "The company is

9   obligated pursuant to a series -- pursuant to

10  the terms of a series of Collective Bargaining

11  Agreements and supplemental agreements thereto

12  to make contributions to the funds."

13          Do you see that, sir?

14     A.    I'm sorry.

15     Q.    It is the second "Whereas" on the

16  first page.

17     A.    You mean this one?

18     Q.    Yes, that is the one I'm referring

19  to.  I see where you are pointing.

20     A.    Yes, it's an obligation to make a

21  payment.

22     Q.    Do any of the collective bargaining

23  agreements that are referred to in the

24  "Whereas" contain the exception of the first

25  three months of employment that you have

1               MARKUS

2    identified as having reached as a verbal

3    agreement with Wilfredo?

4         A.    You mean over here?

5         Q.    Yes.

6         A.    No, it doesn't say anything about

7    it.

8         Q.    At the time you signed the March 20,

9    2003 agreement, did you have a verbal agreement

10   with Wilfredo that contributions would not be

11   required for the first three months of an

12   employee's employment?

13        A.    I don't remember.  Maybe it was

14   later.  Maybe it was before.  I don't remember.

15        Q.    Can you direct me to a document

16   signed after March 20, 2003 in which Wilfredo

17   acknowledged any exception for contribution

18   obligations for the first three months of an

19   employee's --

20        A.    You'll have to ask Wilfredo there.

21        Q.    Do you know of any such document,

22   sir?

23        A.    No, there wasn't any such documents,

24   so far as I remember.  Like I said at the

25   beginning, it was a verbal agreement between

36

                            MARKUS
1
2   Wilfredo and me.
3        Q.    At the time of the negotiation of
4   the agreement that we identified as Markus 6
5   were you represented by Mr. Zuckerberg?
6        A.    I don't remember.  I don't think so.
7        Q.    You need to kind of -- I don't mind
8   if you consult with Mr. Zuckerberg.
9        A.    I don't think so.
10       Q.    Do you know who you were repped by,
11  sir, if anyone?
12            MR. ZUCKERBERG:  Let me help you
13       with this, and I'll just point everybody
14       to paragraph 10.  I think paragraph 10
15       will help you answer that question.
16            MR. KENNEDY:  I see, yes.
17       Q.    If you look at paragraph 10, sir,
18  it's on the third page.
19            (Witness reading document.)
20       Q.    You see the reference to
21  Mr. Zuckerberg?
22       A.    So he was there.  If it says Josh
23  Zuckerberg, then he was there.  I don't think
24  Josh was in the meeting.
25       Q.    I'm not asking you that.  I'm just

37

MARKUS

1  asking you if at the time of the agreement in

2  March 20, 2003 if you were represented by

3  Mr. Zuckerberg.

4      A.    It looks like.

5      Q.    In the verbal agreement that you

6  reached with Wilfredo about the people not

7  going into the union for the first three months

8  after their hire, was that agreement reached

9  with Mr. Wilfredo before or after you were

10  represented by Mr. Zuckerberg?

11      A.    I don't remember.

12      Q.    It could have been after you were

13  represented by Mr. Zuckerberg?

14      A.    Possible.

15      Q.    It could have been before you were

16  represented by Mr. Zuckerberg?

17      A.    Possible.  We had a lot of meetings

18  between Wilfredo and me without any lawyers.

19      Q.    I would like you to look at Markus

20  Exhibit 3 which I believe, sir, is right there.

21      A.    Yes.

22      Q.    This agreement is the collective

23  bargaining contract, the changes I guess in the

24  collective bargaining contract for the period

39

MARKUS

A.    Eleven and a half percent.

Q.    I notice paragraph 5 provides for a trial period of three months.  Do you see that, sir?

A.    Right.

Q.    Is there any part of this document, Markus 3, that you would point to in support of your argument that during a trial period the employer wasn't obligated to make contributions to the insurance retirement or scholarship fund?

A.    I don't remember.

Q.    Well, take a look at it.  You're an experienced businessman, sir.

A.    You see, I can say yes, I can say no, but it's not fair because I don't want to lie.  I don't remember how we make agreements.

Q.    I want to be very clear, I'm not asking you for a legal conclusion.  I'm asking you as a businessman.  You did sign this document?

A.    Yes, I did sign this.

Q.    Were there any paragraphs in here that you understood as allowing you not to make

47

MARKUS

1
2      signed, is there any reference by your

3      understanding to the -- to an agreement that in

4      the first three months health and pension

5      contributions are not obligated to be paid?

6          A.    I'm sorry.  I didn't understand your

7      question.

8          Q.    The first three pages that are

9      signed by you and have the handwritten changes,

10     do you understand any of these paragraphs to

11     show this verbal agreement that no

12     contributions are owed for the first ninety

13     days?

14         A.    It doesn't show anything about

15     anything.  It does not.

16         Q.    The document that we have identified

17     as Markus Exhibit 5, is that the current

18     collective bargaining agreement between Miron &

19     Sons and the laundry workers union?

20              MR. ZUCKERBERG:  Objection.

21              You can answer if you know.

22         A.    I don't know.  I don't answer.  I

23     don't know.

24         Q.    Do you know -- this stipulation

25     appears to be dated November 27, 2006?

48

1                              MARKUS

2          A.      Right.

3          Q.      Is that about the date you signed

4     it?

5          A.      I don't remember.

6          Q.      After signing this agreement dated

7     November 27, 2006, did you sign any other

8     agreements with the union?

9          A.      I don't remember.

10         Q.      Do you know of any agreements after

11    November 27, 2006 that are in writing that

12    would change or affect Miron & Sons'

13    obligations to make contributions to the

14    benefit fund?

15         A.      I don't remember.

16                 MR. ZUCKERBERG:  Off the record.

17                 (A recess was taken from 12:34 p.m.

18         until 12:42 p.m.)

19         Q.      So I would like to direct your

20    attention to what we have marked as Myron

21    Exhibit 2.  That is the large document, sir.

22         A.      Yes.

23         Q.      Page 4.

24         A.      Yes.

25         Q.      Paragraph 1 is entitled, "Unit," and

63

MARKUS

1
2  people who belongs to my family; let me put

3  this this way.  I can't put it another way.

4      Q.    Is it fair to say most of those

5  people have Russian names?

6      A.    No, not everybody.

7      Q.    I believe all of the names on

8  exhibit, rather, page 2 of Exhibit 7 are

9  Hispanic; is that fair to say?

10     A.    I beg your pardon?

11     Q.    Are all the names Hispanic?

12     A.    No, it's not Spanish, no.  It's

13  different people.  Djiteye is an African girl.

14  I see that.  The name is D-J-I-T-E-Y-E.

15     Q.    When putting together the list of

16  people on which contributions were made for

17  this July 19th date, did you include employees

18  in the group represented by the union that had

19  not been there three months yet?

20     A.    No.

21     Q.    So this list excludes the people who

22  hadn't been there ninety days or three months?

23     A.    Right.  This does not include these

24  people, of course.

25     Q.    Does this group include part-timers?

64

1                          MARKUS

2        A.    No.

3        Q.    Did you have any agreement with the

4   union that you could exclude part-timers from

5   the group on which contributions were made?

6        A.    Let me put it this way:  I tried to

7   refresh my memory.  It was -- I have to

8   calculate back.  We have 2007, right.  2005,

9   1995, 1993, about 1987, 1988, it was set up

10  that if you have part-timers, then not included

11  are union member if they are working up to

12  certain amount of hours.

13         At that time nobody did pick up

14  these questions and nobody bothered with me.

15  Nobody had a conversation with me about these

16  part-timers.

17       Q.    Was this an agreement that you

18  reached with someone from the union?

19       A.    I really don't remember.  I tell you

20  honest, because it was so many years.  About

21  1987, 1988, something like this, maybe 1986

22  even.  I don't remember exactly.

23         I know I was on the -- it was 130th

24  Street in Harlem those times we get this

25  agreement, really too many years ago, and

65

MARKUS

1    nobody, nobody talk to me about part-timers
2    even, never.
3
4              Just pick up about half a year ago,
5    just start talking to me, "Miron, you're not
6    allowed to have part-timers."
7              I say, "Why?"
8              "They work a short time."
9              "And why am I supposed to cover them
10   if they are not supposed to get benefits?"
11        Q.    I'm trying to understand the
12   agreement.  The agreement was reached sometime
13   in 1986 or 1987?
14        A.    Right.
15        Q.    What specifically was the agreement
16   that was reached?
17        A.    Part-timers do not include on the
18   union and benefit funds.
19        Q.    How were you defining part-timers
20   for the purposes of that agreement?
21        A.    I don't remember already, but I
22   think it was certain amount of hours.
23        Q.    How many hours?
24        A.    I don't remember.  I tell you
25   honestly, I don't remember.

68

1                          MARKUS

2        Q.    So a mechanic is a job that is in

3    the Laundry Workers Union bargaining unit,

4    correct?

5              MR. ZUCKERBERG:   Objection.

6        A.    If he is part-timer, no.   That is my

7    mentality.

8        Q.    Putting aside part-time or

9    full-time, if he were full-time -- let me put

10   it this way -- he would be in the bargaining

11   unit represented by the laundry workers?

12       A.    Yes, of course.

13       Q.    You're complaining this particular

14   individual was not because he was a part-timer?

15       A.    He was working like a part-timer,

16   right.

17       Q.    Is there anything in any of the

18   contracts we have identified, the '03 contract,

19   the '06 contract, the '04 stipulation, any

20   other agreement that in writing says

21   part-timers are not covered under the union

22   contract?

23       A.    Like I said before, it's never say

24   cover or non-cover.   In any contract you will

25   not find that it says part-timers before or

69

MARKUS

1
2      after this certain amount, I'm not supposed to
3      be covered or they cover.
4          Q.    Well, when it says -- the contract
5      says all employees, wouldn't the phrase "all
6      employees" mean full-time employees and
7      part-time employees?
8          A.    No, I don't agree with you.
9          Q.    Why do you not agree with that, sir?
10         A.    Because it says, "All employees,"
11     but it does not say, "Supervisor not included,
12     office people not included."
13              I give an example.  I have a porter.
14     He is working two hours per day.  That's it.
15     He come in at 6:00 o'clock at night and he go
16     home at 8:00 o'clock at night.  It is a
17     part-timer.  He work six days a week, eighteen
18     hours per week.  That's all.  Even I think
19     three hours a day, an hour, eighteen hours per
20     week, that's it.
21              I pay him salary even.  Why?
22     Because you see, I don't stand behind him and
23     watch what he is doing, if he sweep slower or
24     faster, if he is talking or if he is playing.
25     For his work I pay him salary, but he come in

77

MARKUS

1

2      document --

3          A.    This situation was picked up by Josh

4      to me when he mentioned something about me

5      going to court.

6                I said, "For what?"

7                "For part-timers."

8                I said, "Why?"  It was my verbal

9      agreement with Wilfredo, before Wilfredo was

10     born even, before he was born.

11         Q.    Before he was born?

12         A.    Yes, part-timers not included.  I

13     mean before he came to the union, I mean.

14     Because he came to the union, I don't remember

15     how many years ago.

16               MR. ZUCKERBERG:  Miron, for point of

17          clarification, who did you deal with when

18          you first started dealing with the union?

19          Was that with Clay Brown?

20               THE WITNESS:  No, I think she wasn't

21          there.  She came about -- it was some

22          Jewish guy.  I don't remember his name

23          before Clay.  Clay was his assistant, and

24          then Clay became the manager.

25               Josh, I want you to understand how

83

MARKUS

some people came from United Tax, some people
we transfer from part-time, from part-timer to
full-time because we grow.  We are going to
need more hours, more job, more people.

Q.    So is it fair to say then that in
October of '07 you still weren't paying on
people you considered part-timers?

A.    Yes.

Q.    And you weren't paying on people on
their first ninety days of employment if they
were full-time?

A.    Yes.  Some of these people pass
ninety days, and I put them in union.
Amalgamated do exactly the same.  They don't
cover six months, but they pay for their
benefits, right.

Q.    I notice that in --

A.    Probably next month you'll see more
people.

Q.    November 1st, if you look at
Exhibit M13, the last page, we were up to 56 or
57 employees in which you were paying?

A.    Very possible.  Like I explain to
you, Mr. Kennedy, you see, I don't play -- I

1                    MARKUS

2          is last name, first name, don't you think,

3          Miron?

4          A.    It's the last name, and the first

5    name is Simonis.

6          Q.    That would make more sense, yes.

7                If you look at the second name, Jose

8    Acevedo, on the document your looking at,

9    sir --

10         A.    Yes.

11         Q.    -- the handwriting says, "Worked one

12   month"?

13         A.    I don't know who write it.  I tell

14   you it's impossible.  It can't be for one month

15   because $1,900 isn't earned for one month, but

16   it's definitely not my writing, definitely.

17         Q.    Am I correct that your firm, B&M

18   Linen, produced these NYS-45's to the fund?

19         A.    Yes.

20         Q.    And we are referring to --

21         A.    I don't know who was writing this

22   because I gave to them without any notes to

23   auditor.  It's not -- you can see my writing.

24         Q.    No, I accept your testimony that

25   it's not you're writing, sir.  I'm just trying

104

MARKUS

1

2   to find out whose writing it is.

3       A.    I don't know.

4       Q.    If you look at the last name on this

5   sheet of the third quarter of '05 report, where

6   it is Yunicy Beato?

7       A.    The same paper?

8       Q.    The same page, yes.

9       A.    Yes.

10      Q.    Do you see next to that is the

11  handwritten words, "Part-time"?

12      A.    Right.

13      Q.    Do you know who would have written

14  that?

15      A.    The same person, but I don't know

16  who did it.  I really don't know.

17      Q.    Now, if you examine all of those --

18      A.    Do you have another copy with this

19  marking?  I could ask my secretary who do it.

20      Q.    Well, the copy your attorney has has

21  the marking on it, too.

22      A.    Okay.  I'll ask my secretary,

23  because I don't know who did it.

24      Q.    When did you provide the benefit

25  fund with these New York State 45 or NYS-45

105

MARKUS

1

2    forms?

3         A.    When I owed it, maybe two months

4    ago.

5         Q.    It was sometime in '07, correct?

6         A.    Yes, end of '07.  One second.

7         Q.    The last one I have is the second

8    quarter of '07.

9         A.    I see '07.

10        Q.    You notice on the upper right-hand

11   portion there is an X next to which quarter it

12   is?

13        A.    I don't see.

14        Q.    Would you hand me those documents,

15   and I'll find it for you?

16        A.    Yes, please.

17              (Handing.)

18        Q.    Yes, this is the first quarter '07,

19   Markus 34.

20        A.    Now I see it's the second quarter.

21   That's all.  You have second quarter.  This was

22   probably the end of 2007.

23        Q.    Who is it who had discussed custody

24   of these documents before they were given to

25   the fund?

1                          MARKUS
2      other things that are said on these papers?
3          A.    No, I don't know.
4          Q.    Would you agree with me it's
5      probably something that somebody from your firm
6      told the funds?
7                    MR. ZUCKERBERG:  Objection.
8                    You can answer.
9          A.    I don't know.  Very possible,
10     because Amalgamated doesn't know who is who.
11         Q.    I'm really trying to make you
12     remember, if you can, how these handwritten
13     notations got on these NYS-45 forms.
14         A.    I told you I don't remember.  I
15     don't want to lie.  I'm not in condition to lie
16     even.  It's not worth it.  I see a lot of
17     mistakes that is not supposed to be.  I tell
18     you honestly.  It's unbelievable, like you see
19     work one month, I have to check who is Jose
20     Acevedo.  I don't know who is he.
21              Like I explained to you before, we
22     have meetings with Wilfredo.  People come in
23     and go.  They working one week, three weeks,
24     month, month and a half, gone.  Let me make
25     agreement that up to three months, if people

138

MARKUS

2  p.m., February 19, 2007."

3          Do you see that, sir, on the upper

4  left-hand portion?

5          A.    Yes.

6          Q.    Am I right this is an employee

7  contact list that was created by B&M Linen

8  Corp.?

9          A.    Yes, it is.

10         Q.    And the typed-in names under the

11  word "Employee," were they also added by your

12  firm, sir?

13         A.    Yes.

14         Q.    And then the -- it appears to the

15  right of those names, and there seem to be 113

16  of them.  I notice they are numbered?

17         A.    No, they have no numbers.  Oh,

18  somebody count here.  I see somebody count.

19         Q.    If you look at the first page, just

20  so you understand what I'm referring to, do you

21  see in between "Employee" and "Signatures"

22  there is a series of handwritten numbers?

23         A.    Yes, I see it.  Somebody count.

24  That's okay.

25         Q.    These signatures to the right, do

147

MARKUS

1

2      Q.    That's the first time you saw it?

3      A.    That's the first time Josh showed me

4  this paper.

5            I said, "Josh, give me copy of this

6  paper, and I will look up on computer people

7  were working, how they were working, where they

8  were working," and that's what I did.  You can

9  see it.

10     Q.    I have one, sir.  Josh was kind

11  enough to send it to me.

12     A.    I especially had him prepare it.

13           MR. KENNEDY:  I'm just marking this

14     as Exhibit 48.

15           THE WITNESS:  Okay.  No problem.

16           (Whereupon an employee contact list

17     with a date of origin of February 3, 2008

18     was marked as Markus Exhibit 48 for

19     identification, as of this date.)

20     Q.    I would like to show you a document

21  I have marked as Exhibit 48 which is identified

22  as employee contact list, but it is -- date of

23  origin appears to be February 3rd, 2008.

24           Do you recognize that, sir?

25     A.    Yes.

148

MARKUS

1

2    Q.    What is it?

3    A.    I get these names from my counsel,

4  from my counsel.

5    Q.    From your attorney, correct, sir?

6    A.    From my attorney, and I prepare for

7  him to mark each person individual, what days

8  they were hired, for people who continue

9  working.  For people who not working anymore, I

10  put in and out as of the date of hiring, the

11  first and last day of working to every single

12  person.  Yes, I did prepare it and I send it to

13  Josh.

14    Q.    So, for instance, you identified a

15  Braulio A. Leon as the boiler engineer?

16    A.    Right.

17    Q.    I take it you wrote that in, sir?

18    A.    Yes, I did.

19    Q.    And Catalina Dominguez is the office

20  secretary?

21    A.    Catalina, yes.

22    Q.    And Elena Mendelvich is a chief

23  engineer?

24    A.    Yes, Elena, yes.

25    Q.    That's all information you put on

152

MARKUS

1 different question, but I spoke to George

2 before I withdraw his name, and if you take a

3 look at the record, you'll see his name over

4 there before he become chief engineer.

5         Q.    What about the category of porter?

6         A.    Okay, I have four people who come in

7 for two, three hours per day to clean shop and

8 clean equipment. I pay them salary. They have

9 a very high salary, I swear to God. Maximum

10 they are working five or six days, eighteen

11 hours per week. Sometimes they are working

12 twelve hours, twelve and a half, that's all.

13 It's like -- it's not part-timers even, and

14 believe it or not they quit every three or four

15 months. So far I have only one person who was

16 working more than a year.

17         Q.    You don't make payments to the funds

18 for those people?

19         A.    No, of course not. Even I mark on

20 this paper it's a porter. It is people who

21 come in to clean. Yes, they get salaries.

22 They don't get per hour, because if the paper

23 says per hour, I would have nobody.

24         Q.    I notice on the second page of the

154

MARKUS

1
2        I said, "So you have to go."  She
3   left.
4        About -- I don't remember, two
5   months later she came back again, the same
6   picture, different Social Security.  Again, I
7   hire her.  Again, she is gone.
8        · After she came back, and in about a
9   week she said that she is pregnant.  I said,
10  "Okay, what do you want me to do?"
11           "Now I'm going."
12           Now she came back again.  She
13  delivered baby.  I says, "Anna, can you show me
14  your picture ID with Social Security?"
15           She showed me.  She said, "Miron,
16  it's now mine."
17           I said, "Are you sure it's yours?"
18           "Yes," so I hired her again.
19           I have several people like this,
20  because people come in, they give Social
21  Security.  How did they get letter from Social
22  Security office?  The Social Security not
23  function, so I have to let them go.
24      Q.    When Anna Martinez was working at
25  the shop, she was always working in a union

155

MARKUS

1
2    job, correct?

3         A.    No, she was working about one or two

4    weeks and gone, one or two weeks and gone

5    again.

6         Q.    In the one or two weeks she was

7    there, what was she doing?

8         A.    She was feeder.

9         Q.    What is a feeder?

10        A.    She feeding sheets.

11        Q.    She is feeding sheets into the

12   washing machine?

13        A.    No, to press.  It is a final

14   section, not a washing section.

15        Q.    A final section?

16        A.    Yes, we have feeder, we have ironer

17   and folder.  Feeding people connect to clamp

18   sheet.  They call it -- professionals call it

19   feeder, because they are like feed sheets.

20        Q.    So they put sheets into the pressing

21   machine?

22        A.    Right -- not into the pressing

23   machine, the feeder machine.

24        Q.    That is a job that is covered by the

25   union contract?

156

MARKUS

1
2     A.    Yes, yes, any job covered by union

3    contract.

4     Q.    So let's look at Angel Lecen, the

5    fourth name, L-A-C-E-N, hired January 28, 2003.

6     A.    Correct.

7     Q.    What job does Angel hold?

8     A.    Helper.

9     Q.    That is a job covered by the union

10   contract, correct?

11     A.    Yes.

12     Q.    Did you make health contributions

13   for Angel Lacen?

14     A.    No.

15     Q.    Why not?

16     A.    The kid doesn't want to be union.

17     Q.    So is it up to him who gets to be in

18   the union?

19     A.    Mr. Kennedy, let me explain to you

20   what we did.  Our -- how we working with union

21   or have been working, let me put it this way,

22   before Wilfredo.  I have -- for example, I have

23   Rodrigo Vaquero, R-O-D-R-I-G-O, V-A-Q-U-E-R-O.

24     Q.    So what is the story with

25   Mr. Vaquero?

157

MARKUS

1

2       A.     He is a manager, but he came to us

3   and says, "Miron, I need benefits."

4              "Okay, fill out application.  Talk

5   to Wilfredo."

6              I talk to George.  I say, "Do you

7   mind he be union?"

8              "Okay."  I have plant manager

9   belongs to union.

10      Q.     Yeah, I know.

11      A.     But I have people who tell me, "You

12  are going to put me in union, I'm going to quit

13  from your job right away."

14             What do you want me to do?  Put

15  yourself in my shoes.  He's a very good helper.

16  He work a lot of time with us.  He is very

17  flexible.  He doesn't want it.  Why?  He

18  doesn't answer me even why.  He says, "I don't

19  want it."  That's all.

20      Q.     What about Angela P-A-Y-E-R-O?

21      A.     Same picture.  She doesn't want it.

22  I offer her to be supervisor.  She doesn't want

23  to be supervisor.  She wants to work.

24      Q.     What about D-E-Y-A-D-E?  That's the

25  first name.  The second name is

158

                        MARKUS

1

2    D-J-A-B-A-K-A-T-I-E.

3         A.    The same answer.

4         Q.    What job does that person hold?

5         A.    He is a feeder.

6         Q.    How about Dulce Silva, S-I-L-V-A?

7         A.    She is a towel folder.

8         Q.    That is a union job, correct?

9         A.    All of them union job.  Every job in

10   the shop is union job.  Of course, I don't

11   confuse it.

12              Mr. Kennedy, understand me correct,

13   I run business like this.  If person tell me,

14   "I don't want it what am I going to do, punch

15   him?"  Like I remember it was Clay Brown time.

16        Q.    You mean it was during the period of

17   time in which Clayola Brown was the manager of

18   the union?

19        A.    Right, and who was my

20   representative.  I don't remember even.  I

21   don't remember.  He came into one of my

22   employees and tell them, "You're fired."  I

23   don't remember even who was there.

24              This employee came to me and says,

25   "Miron, who is this person?"

161

MARKUS

1

2     Q.     Were contributions made?

3     A.     He didn't pay anything.

4     Q.     Then look at Eduardo Rosado.

5     A.     Yes.

6     Q.     He was hired on February 1, '07 and

7 last worked April 29, '07?

8     A.     Right.

9     Q.     Was that in a union job?

10     A.     I don't remember what he did even.

11 Any job in the shop was a union, but my

12 agreement with Wilfredo was up to three months

13 nonunion.

14     Q.     So that's why no contributions were

15 made on his behalf?

16     A.     Right.

17     Q.     And what about Eliseo Tomas, hired

18 August 12, '02?

19     A.     He was helper, and -- I didn't pay

20 for his benefits.

21     Q.     Was there any reason for that?

22     A.     I told you what reason is.

23     Q.     He didn't want to be?

24     A.     It's crazy reason, but that's what

25 it is.

162

MARKUS

Q.    He didn't want to be in the union?

A.    (Witness shakes head.)

Q.    Are you agreeing with that, sir? You didn't say anything.  You just shook your head.

A.    Yes, I agree with it.

Q.    Is the same true for Mr. Elvis Gotoy, who I gather was hired in January '07 and was no longer there on 10/1/07?

A.    I think he was union.  I have to check it.

Q.    So you may have made contributions on his behalf?

A.    It's possible I did, but I'm not sure because he was working so short time.

You know what?  Give me one second, please, if you don't mind.

Q.    Sure.

A.    He start to work on October 2007. Yes, he was union.

Q.    And you made contributions on his behalf?

A.    Look.

Q.    I believe you.  Okay, terrific.

164

                    MARKUS

1

2    because I got letter from Social Security

3    office about her personal.  What she did

4    before, I don't know.

5              The same like you have Rosa -- where

6    is Rosa?  Rosa Rivera.  It's second page.

7         Q.    I see her name.  Hired June 4th,

8    last worked June 19, '07?

9         A.    She departed from United States

10   already.  She was in court, and the court

11   decision.  She is illegal.

12        Q.    Do you know what job she held?

13        A.    I don't remember.  She only worked a

14   couple of weeks and was gone.

15        Q.    What about Maria Garcia?  She was

16   hired July 14, 2005.  She is three from the

17   bottom on the first page.

18        A.    Yes, she work a long time.  George

19   talk to her about ten times.

20        Q.    What job did she hold, sir?

21        A.    She is a towel folder.  It is a

22   union job.  George talk to her.  She sent him

23   to hell straight without any explanation.

24        Q.    Did you make any payments on her

25   behalf?

1                         MARKUS

2          A.    No.

3          Q.    What about Mariela Pesado?

4          A.    Same picture.

5          Q.    Did she do the same job?

6          A.    Yes.

7          Q.    What about Sylvia N-O-R-A-L-E-Z?

8    She is about ten from the bottom on the second

9    page, hired on July 10th, 2006, appears to

10   still be working there?

11         A.    I let George talk to her.

12         Q.    Do you know what job she holds, sir?

13         A.    Towel folder.  She is a very good

14   worker.

15         Q.    Did you make payments on her behalf?

16         A.    No.

17         Q.    What about Sugelly, S-U-J-E-L-L-Y,

18   Cruz?

19         A.    She is a good worker.

20         Q.    Do you know what job she holds?

21         A.    She does union job.

22         Q.    Did you make payments on her behalf,

23   sir?

24         A.    No.

25         Q.    What about the next two people,

166

MARKUS

Teresa Martinez and Victor Alcantara?

    A.     Teresa Martinez, exactly the same.
She is union job.  I don't pay any benefits.

    Q.     Is that because she said she didn't
want to?

    A.     Right.

    Q.     What about Victor Alcantara?  Is
there something funny about Mr. Alcantara?

    A.     He is a great driver.  He is a great
driver.  I cannot do nothing.

    Q.     The drivers are in the union,
correct, sir?

    A.     Yes, but he's not union.

    Q.     Did you make payments on his behalf?

    A.     No.

    Q.     What about the last name, Yosepat
Garcia?  She apparently was hired April 13,
'07.  Do you know what job she has?

    A.     He has -- he is in the washing
department, receiver.

    Q.     That's a union job, correct, sir?

    A.     Why he.

    Q.     You didn't make payments on his
behalf, either?

167

MARKUS

1

2      A.     No.

3            MR. KENNEDY:  I have no further

4      questions of the witness at this time.

5            MR. ZUCKERBERG:  While we are on the

6      record, let me just make a supplement to

7      my document request.  I would like to have

8      produced the dues authorization check-off

9      card for whatever document the union uses

10     at Miron's shop to authorize dues

11     check-off.

12           MR. KENNEDY:  We will deem your

13     request to be amended to include that

14     which is not to be interpreted as

15     consented.  We will produce it.

16           MR. ZUCKERBERG:  Understood.

17   REQUEST

18           MR. KENNEDY:  Do you have any

19     questions of Miron?

20           MR. ZUCKERBERG:  I do not.

21           MR. KENNEDY:  Let's go off the

22     record then.

23           (Time noted:  12:42 p.m.)

24

25

# EXHIBIT B

Page 1

1    UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF NEW YORK

     -------------------------------------X

3    TRUSTEES OF THE LAUNDRY, DRY-CLEANING
     WORKERS AND ALLIED INDUSTRIES HEALTH
4    FUND, UNITE HERE; and TRUSTEES OF THE
     LAUNDRY, DRY-CLEANING WORKERS AND
5    ALLIED INDUSTRIES RETIREMENT FUND,
     UNITE HERE,

6                        Plaintiffs,

7              -against-        07-CV-6999 (DLC)

8    B&M LINEN CORP. D/B/A MIRON & SONS
     LINEN SUPPLY A/K/A MIRON & SONS LINEN,
9    INC.,

10

                       Defendants.

11   -------------------------------------X

12

13

14            DEPOSITION OF WILFREDO LARANCUENT

15                 New York, New York

16             Wednesday, February 20, 2008

17

18

19

20

21

22   Reported by:

23   Angela M. Shaw-Crockett, CSR, RPR

24   Job No. 15450

25

1                    W. LARANCUENT - 2/20/08

2     as an organizer.  Became organizing director some

3     years later.  Became secretary treasurer some years

4     after that and then became manager in 2000.

5          Q.    Manager in 2000.

6               Did you ever work for the defendant B&M

7     Linen Corp. as an employee?

8          A.    No.

9          Q.    And what is your current position with the

10    union?

11         A.    I am the manager of the Laundry,

12    Dry-Cleaning and Allied Workers Joint Board of UNITE

13    HERE.

14         Q.    In terms of the hierarchy of the union,

15    where does that manager's position fit?

16         A.    I'm also international vice-president, if

17    that's what you're asking.

18               MR. KENNEDY:  Manager is CEO of the joint

19         board.  Would you agree with that, Wilfredo?

20               THE WITNESS:  Yes.

21    BY MR. ZUCKERBERG:

22         Q.    Do you report to anybody?

23         A.    Yes.  I report to my board, my board of

24    directors.  I also have to file reports with my

25    international.

1                    W. LARANCUENT - 2/20/08

2    trustees.

3         Q.    And who are they?

4         A.    There are three from the union side.  One

5    is Bruce Raynor, president of the union; the other

6    is Albert Arroyo, secretary/treasurer of the joint

7    board; and myself.

8              And on the employer's side, there is

9    Michael Potack, who is the president, I guess, of

10   Unitex Textile Rental; there is Stanley Israel, who

11   is an attorney for many of the employers in the

12   industry; and there is a gentleman called Brian

13   Santanella.  He is the president of a laundry called

14   Sanitary Linen.

15        Q.    And what about on the health fund?

16        A.    They are the same trustees.

17        Q.    And do you draw any compensation from your

18   work on the funds?

19        A.    No, I do not.

20        Q.    How often do the trustees meet?

21        A.    As you could imagine, they're busy people,

22   but we try to meet three times a year.  Sometimes

23   it's four; sometimes it's two.

24        Q.    Currently, how many employers have a

25   collective bargaining relationship with the union?

# EXHIBIT C

Page 1

 1     UNITED STATES DISTRICT COURT

 2     SOUTHERN DISTRICT OF NEW YORK

       ------------------------------------------X
 3     TRUSTEES OF THE LAUNDRY, DRY-CLEANING

       WORKERS AND ALLIED INDUSTRIES HEALTH

 4     FUND, UNITE HERE; and TRUSTEES OF THE

       LAUNDRY, DRY-CLEANING WORKERS AND

 5     ALLIED INDUSTRIES RETIREMENT FUND,

       UNITE HERE,

 6                          Plaintiffs,

 7              -against-        07-CV-6999 (DLC)

 8     B&M LINEN CORP. D/B/A MIRON & SONS

       LINEN SUPPLY A/K/A MIRON & SONS LINEN,

 9     INC.,

10

                         Defendants.
11     ------------------------------------------X

12

13

14              DEPOSITION OF GABRIEL VONLEH

15                 New York, New York

16              Wednesday, February 27, 2008

17

18

19

20

21

22     Reported by:

23     Angela M. Shaw-Crockett, CSR, RPR

24     Job No. 15575

25

Page 25

1                          G. VONLEH - 2/27/08

2    BY MR. ZUCKERBERG:

3         Q.   Currently, has the fund, at any time,

4    received records, payroll records or the records

5    necessary to do an audit, from the defendant for the

6    period 2004, if you know?

7         A.   I will say on this, to the best of my

8    recollection, I will say we have not received

9    information for '04.

10        Q.   Let me call your attention to the number

11   of 587,495.32, which is in the first row of the

12   chart on page 2 of Defendant 2.

13             MS. PILECKI:  For the period 4/04 to

14        11/04?

15             MR. ZUCKERBERG:  Correct.

16   BY MR. ZUCKERBERG:

17        Q.   That number is an estimate number?

18        A.   This particular number is based on the

19   information we have available, which will -- so it's

20   a reflection of information that's been provided for

21   us of his current employee count and, I believe,

22   ranging from the period of 2005.

23        Q.   Okay.  So the 2004 number is based on

24   records for 2005; is that correct?

25        A.   Correct.

1                    G. VONLEH - 2/27/08

2     by the individual reflected on that NYS-45.

3          Q.    So the answer, though, to the question as

4     to whether or not the fund made any upward

5     adjustments to the numbers reported on the NYS-45 is

6     no?

7          A.    That's correct.

8          Q.    They accepted the numbers as being

9     accurate?

10         A.    That's correct.

11         Q.    And the numbers that are reflected --

12    other than for '04, the numbers reflected in this

13    chart on page 2 of Defendant 2 come directly from

14    the NYS-45?

15         A.    Correct.

16         Q.    Are there any employees listed on the

17    NYS-45s that are not included in this calculation?

18         A.    Yes.

19         Q.    Okay.  Is there a way to describe in a

20    category who those employees are?

21         A.    I believe the employer had indicated --

22    prior to sending us this document -- supervisors.

23    Those individuals that were indicated as supervisors

24    were excluded.

25         Q.    Okay.  Are there any other employees that

1                    G. VONLEH - 2/27/08

2    were excluded from the fund's calculation?

3         A.    The best of my recollection, I believe

4    supervisors were the primary employee group that

5    were excluded.

6         Q.    Okay.  Let me just show you a document,

7    again, that was marked as Miron Exhibit 32.  I ask

8    you to page through this.

9         A.    (Witness complies.)

10        Q.    And do you recognize this document?

11        A.    Yes.

12        Q.    And what is this document?

13        A.    This is the NYS-45 submitted by the

14   employer to Amalgamated.

15        Q.    And I just want to review some names with

16   you in this report and ask whether or not they were

17   included in the calculation.  My assumption, based

18   on what you've just testified to, is that the answer

19   is going to be yes, but I want to confirm that.

20             Next to the name Jose Acevedo --

21        A.    What page are you on?

22        Q.    It's page 3.

23             MS. PILECKI:  Why don't you go last name,

24        first name as it's listed.

25   BY MR. ZUCKERBERG:

Page 32

1                    G. VONLEH - 2/27/08

2        Q.    Acevedo, Jose, there's a notation "worked

3    one month."  That person was included in the

4    calculation?

5        A.    Correct.

6        Q.    To your understanding, based on your

7    understanding, is there any exclusion for employees

8    based on period of employment with the employer?  In

9    other words, if an employee works two days, is a

10   contribution supposed to be made on behalf of that

11   employee?

12       A.    To the best of my understanding, yes.

13       Q.    So no matter what the length of time is of

14   employment, a contribution needs to be made?

15       A.    Correct.

16       Q.    Afolabi, Lasvpo is listed as part-time.

17   That person was also included in the calculation?

18       A.    Correct.

19       Q.    Alvarez, Jose worked one week.  Also

20   included in the calculation?

21       A.    Correct.

22       Q.    If someone was listed as an office

23   employee, would they have been included in the

24   calculation?

25       A.    It depends on how that is defined.

Page 38

1              G. VONLEH - 2/27/08

2        Q.    Let me ask you this question first:  What

3   relevance does this document have to the calculation

4   that appears in Defendant Exhibit 2, which is the

5   chart that you were referring?

6        A.    This is actually a reflection of the

7   payroll, the actual amount for a given period.

8        Q.    Okay.  So it reflects payroll versus what

9   was reported?

10       A.    Payroll and then also reflection on the

11  percentage charged as a result of the payroll

12  reported.

13            MS. PILECKI:  For clarity sake, can we

14       just ask -- can I ask him one question about

15       the period?

16            MR. ZUCKERBERG:  Sure.

17            MS. PILECKI:  What period of time is the

18       first four pages in this document?

19            THE WITNESS:  2005 January, 2005 December.

20            MS. PILECKI:  So the first four pages

21       covers 2005.  And the second four pages, what

22       period does it cover?

23            THE WITNESS:  This one is 2006 January and

24       2006 December.

25  BY MR. ZUCKERBERG: